# THE STATE v. BROWN, Appellant.

Division Two, March 23, 1904.

1. **JURY: Voir Dire Examination.** A statement by the prosecuting attorney in his *voir dire* examination of jurors of what the State expected to prove on the trial, although an unusual method of examination, is not prejudicial error.

2. **MURDER: Mitigation: Voluntary Drunkenness.** Evidence of voluntary drunkenness is not admissible as being in mitigation of the crime. Testimony that defendant was frequently intoxicated, or that he was drunken the night previous to the homicide, or as to how he acted when drunken, falls far short of any such use of intoxicants as would result in his insanity and is inadmissible.

3. **DEFENDANT AS WITNESS: Cross-Examination.** Where the prosecuting attorney asks defendant about a matter which had not been referred to in his examination in chief, and the court on its own motion refuses to permit the question to be answered, there is no error.

4. **REPUTATION OF DEFENDANT: Other Crimes.** A witness who had testified that defendant's reputation was good, on cross-examination was asked if he had not heard of a previous assault on deceased, his stepdaughter, 14 years old, whom he is charged with having murdered with a club. *Held,* to be proper.

5. **HYPOTHETICAL QUESTION.** A hypothetical question should be based on the facts, or objection thereto sustained.

6. ———: **Right From Wrong.** An expert witness can not be asked his opinion as to whether the accused was capable of judging right from wrong.

7. **OPPROBRIOUS EPITHETS: Murder in Second Degree.** Opprobrious epithets of the character shown by the evidence in this case, applied to the accused by the deceased immediately prior to the homicide, are admissible on account of their tendency to arouse such a heat of passion as might reduce the killing from murder in the first degree to second degree murder. But the same epithets addressed to the accused on the day prior to the homicide neither justified nor mitigates the offense, and should be excluded.

8. **INSTRUCTION: Good Character: Reputation.** Where the court in an instruction given for the State fully and correctly declares the law on the subject of defendant's reputation, there is no necessity for giving a like instruction for defendant.

9. ——: **Motive: When Given.** Where there is no doubt surrounding the perpetration of the crime or the manner in which it is committed, and the evidence for defendant shows that the vile epithets used by deceased furnished the only reason for the commission of the homicide, no instruction on the subject of motive should be given.

10. ——: **Insanity: Drunkenness.** The fact that defendant had been frequently drunken prior to the homicide falls far short of furnishing a basis for an instruction on insanity.

11. ——: **Repetition: Murder In Second Degree.** Where the instruction given for the State fully and correctly declared the law of murder in the second degree it is not error to refuse a like one asked by defendant.

12. ——: **Deliberation: Diseased Mind.** An instruction to the effect that if the jury believe from the evidence that defendant's mind was so weakened and diseased from the continued use of intoxicating drinks as would prevent him from deliberating about the act committed they would find him guilty of murder in the second degree, should be refused if there is an entire absence of any testimony indicating that his mind was so weakened and diseased. Evidence of voluntary drunkenness on defendant's part is not evidence upon which to base such an instruction.

13. **REMARKS OF ATTORNEY: How Preserved.** Exceptions to prejudicial and unwarranted remarks by the prosecuting attorney permitted by the court, must be saved at the time and preserved in the record if such remarks are to be reviewed on appeal.

14. **INFORMATION: Verification.** Since the amendment to the statutes of 1901, informations in felony cases should be verified or supported by affidavit.

15. ——: ——: **Raised By Motion In Arrest Alone: Waiver.** An objection that "the verdict is insufficient to sustain the judgment," even if timely made, does not raise the defect that the information was not supported by affidavit, because no such ground is specified. Nor would a motion in arrest alone suffice to prevent a waiver of the affidavit, even if the motion specified that there was no affidavit to support the information.

16. ———: ———: ———: **Motion In Arrest.** The failure to verify the information does not render it so defective that a motion in arrest would reach it, nor is it such a defect that the Supreme Court should arrest it without motion.

17. ———: ———: **No Part of Information.** The affidavit is no part of the information itself, but a thing separate and apart from the information and something additional thereto.

18. ———: ———: **Purpose.** The purpose of the statute requiring an information to be supported by affidavit is to afford a guaranty of the good faith of the prosecution and to prevent a careless, or vindictive, or reckless prosecution of a citizen.

19. ———: ———: **Province of Motion In Arrest.** A motion in arrest goes only to defects appearing on the face of the indictment or information, and not to an affidavit upon which the information may be based, or which merely verifies the charges in the information itself.

20. ———: ———: **Jurisdiction: Sufficiency: Waiver.** The jurisdiction of the court over a felony case does not depend on the affidavit, neither is the sufficiency of the information affected by it. The filing of the affidavit or the verification of the information is but an additional step which the defendant may or may not waive.

21. ———: ———: **How Raised.** If the defendant fails to challenge the information for the reason that it is not supported by affidavit by motion to quash, he waives the affidavit, and it is too late to raise that objection by motion in arrest. Such objection, however specific, comes too late after verdict. Nor is it a matter to be reached by a demurrer. A motion to quash is the Missouri practice for reaching defects which do not appear on the face of the indictment or information.

Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford,* Judge.

AFFIRMED.

*R. J. Holmden* for appellant.

(1) The statement made by the prosecuting attorney when examining jurors as to their qualifications to sit in the case, commencing with, "The evidence in the case will tend to show," was all improper, but inas-

much as most of the facts stated did not prejudice the rights of appellant we do not object to them. However, the closing remark of this statement, viz., "that Laura Hiblar was killed while sleeping in her bed," was a breach of professional ethics so highly improper and prejudicial to the rights of appellant that it ought not to be tolerated in any court of justice. It is true that the objection was sustained by the trial court and the matter ruled out, but this was not sufficient. The prosecuting attorney should have been instantly and severely reprimanded by the court, and because of its failure so to do appellant is entitled to another hearing. State v. Stubblefield, 157 Mo. 365; State v. Prendible, 165 Mo. 329; State v. Meysenburg, 171 Mo. 1. (2) Evidence as to whether appellant was drunk on the night, a few hours before the killing, should have been admitted for the purpose of showing that he was in such condition when he committed the act that he did not have sufficient capacity of mind to deliberate, thus lowering the crime from murder in the first to murder in the second degree. The "statement" of the facts in the case shows that there was admitted by trial court the evidence of many witnesses to the effect that on numerous occasions they had seen appellant under the influence of liquor, all showing him to be a confirmed drunkard. (3) The evidence as to how appellant acted when drunk; if he was a drunken man, and whether he was drunk or sober the night before the killing; also evidence of Dr. Sheling as to the effect of alcohol upon the human mind, and the responsibility of a person for acts done while under the influence of intoxication and who has long been a drunkard, should have been admitted for the purpose of proving that appellant not only did not have the capacity to deliberate at the time of the killing, but that he was in such a condition he could not have known the difference between right and wrong of the act he committed. At any rate the jury should have been permitted to hear this evidence, instructed by the court, as

requested, and allowed to deliberate and pass upon this question. State v. Potts, 100 N. C. 460; People v. Mc-Elvaine, 125 N. Y. 596; State v. Reed, 41 La. Ann. 582; R. S. 1899, sec. 2561. The evidence shows appellant to have been a confirmed drunkard and that such continued drunkenness was sufficient to affect in a marked degree his mental faculties. State v. Lowe, 93 Mo. 552; State v. Duestrow, 127 Mo. 72; State v. Hundley, 46 Mo. 414; State v. Riley, 100 Mo. 499. (4) Appellant, after stating that he had gone home late at night and found the door locked and wife and child in bed, was asked these questions: "What did you have a hatchet for?" and "Didn't you have a hatchet?" Counsel for defense objected to the first question when asked, but the record does not so show. The court, however, sustained the objection and ruled out the testimony. This was not sufficient; the prosecuting attorney should have been instantly and severely reprimanded. The State having asked the questions of appellant as to the striking of the girl, he should have been permitted to say whether she had called him a son-of-a-bitch before. The purpose of this was to show that he had once struck her and that it was for calling him this name. A father has the right to reasonably punish his child. State v. Prendible, 165 Mo. 359; State v. Lockett, 168 Mo. 489; State v. Duestrow, 137 Mo. 86; State v. Blitz, 71 S. W. 1029. (5) The court erred in allowing the prosecuting attorney to make the statement with respect to appellant's "skulking around like a hyena." The animal referred to is one of the most treacherous and cowardly known, and though the prosecutor did not directly call appellant a hyena, the broad inference was easily understood by the jury, and the remark was abuse. If the direct calling of defendant by such name is abuse and error, then the indirect method is also abuse. One poisons as much as the other. State v. Jackson, 95 Mo. 653; State v. Young, 99 Mo. 683; State v. Ulrich, 110 Mo. 365; State v. Fischer, 124 Mo. 464; State v. Bobbst,

131 Mo. 339; State v. Prendible, 165 Mo. 359; State v. King, 74 S. W. 630.    (6)    The instruction asked by appellant on motive should have been given.    State v. David, 131 Mo. 397; State v. Foley, 144 Mo. 621; State v. Evans, 158 Mo. 609; State v. Brown, 168 Mo. 471; State v. Tettaton, 159 Mo. 368; State v. Hathron, 166 Mo. 240; State v. Coleman, 20 S. C. 441; People v. Ah Tung, 17 Cal. 379.    (7)    The court erred in refusing instructions 7 and 8 asked by the defense.    (a)    No. 7 asks the court, among other things, to instruct the jury that the epithet addressed by deceased to appellant was an opprobrious one.    The court in an instruction on behalf of the State told the jury "that opprobrious epithets or insulting gestures when applied to a person constitute a just cause of provocation to passion," but did not define the term "opprobrious epithet."    The words used by deceased constituted an opprobrious epithet and the court should have so instructed the jury. The State contended that the girl was killed while sleeping; the defense claimed that she addressed to appellant the epithet mentioned and that he was in a heat of passion and drunk when act was committed.    On this theory the trial was conducted and this phase of the case should have been presented to the jury.    (b)    Instruction 8 asked by appellant was in reference to drunkenness. With few exceptions this court has held on numerous occasions that "voluntary drunkenness constitutes no excuse or extenuation for the crime of murder.    It is not even competent for the jury's consideration on the question of defendant's deliberation, premeditation or willfullness."    Counsel for appellant, however, considers the facts of this case, and the numerous authorities holding the opposite view, sufficient to ask the court to again consider this question. The first case seemingly in this State is that of State v. Schaller, 14 Mo. 502, where the almost universal ruling on the question seems to have been first laid down.    However, there is a little law during this long period of time upholding our con-

tention. It appears from earnest investigation that Missouri now stands almost alone in her position on this important question, and if it be true an overwhelming array of authority supports our contention, and that such doctrine is supported by sounder reason, then it should be changed. Law is general, so wide that even our sovereign State must yield to its influence. State v. Cross, 27 Mo. 339; State v. Edwards, 71 Mo. 326; State v. Sneed, 88 Mo. 142; Hopt v. People, 104 U. S. 634; O'Grady v. State, 36 Neb. 320; Gomer v. Florida, 152; Jones v. State, 29 Ga. 594; 103 Ala. 72; 156 Ind. 435; 8 Lea (Tenn.) 376; 37 Kan. 369; 8 Tex. App. 35; 63 Conn. 388; 1 Marv. (Del.) 492; 165 Ill. 618; 1 Dak. 189; 103 Ia. 168; 88 Ky. 29; 25 Ore. 401; 1 Spier (S. C.) 384; 3 Smeed & M. (Miss.) 518; 10 Pac. (Ariz.) 359; 9 Humph. (Tenn.) 570; 148 Pa. 26; 43 Ohio 332; 3 Wyo. 110; 28 Minn. 426; Thacher Crim. Cas. (Mass.) 163; 32 Gratt. (Va.) 929; 48 Mich. 495; 82 Wis. 23; 95 Cal. 425; 32 La. 1086; 54 Ark. 283; 148 N. Y. 476; 17 Wash. 499; 60 N. J. L. 171.

*Edward C. Crow*, Attorney-General, and *C. D. Corum* for the State.

(1) No request was made to the trial court to rebuke or reprimand the prosecutor, and no exception was taken to the failure of the court to do so. Had the defendant desired a reprimand to be administered, then was the golden opportunity to have made such request, and to have preserved his exception, had the request been refused. State v. Gartrell, 171 Mo. 489. (2) The court permitted both the State and defendant to show that the defendant was under the influence of intoxicating liquor on the day of the murder, and defendant was permitted to show, by several witnesses, that he frequently got drunk. The defendant offered to prove by several other witnesses that he was drunk on the evening before he murdered his stepdaughter. The murder

occurred during the morning.  No error was committed in excluding this testimony.  How could it affect his case, whether he was drunk or sober, on the day prior to the killing?  Such evidence was wholly incompetent and tended to prove no issue.  The court did right in excluding it.  (3)  On cross-examination, the prosecuting attorney interrogated the defendant in reference to a hatchet.  The defendant had not been examined concerning a hatchet during his direct examination.  The court, of its own accord, eliminated such evidence from the record.  No objection was made to the evidence by the defendant.  If it had been made, the voluntary action of the court shows that the objection would have been sustained.  The defendant having failed to object, and except to this matter in the trial court, can not raise the question here.  State v. McCollum, 119 Mo. 496; State v. Waters, 62 Mo. 196; State v. Nocton, 121 Mo. 537; State v. Higgins, 124 Mo. 640; State v. Foster, 115 Mo. 448; State v. Rapp, 142 Mo. 443.  (4)  Witness S. H. Woodson testifies that the general reputation of the defendant in the community where he lived was good.  On cross-examination he was asked if he had not heard that the defendant had struck the deceased in the mouth prior to the killing.  The question was admissible to test the means of knowledge of the witness as to the reputation of the defendant and to ascertain the grounds upon which witness based his estimate of character.  (5)  The record does not show that the father of the defendant was a drunkard.  It does not show that the defendant drank constantly.  It does not show that he was in a drunken stupor at the time that he killed Laura Hiblar.  Hypothetical questions must be based upon the facts which the evidence tends to prove, and not upon supposititious facts or erroneous assumptions.  Rogers on Expert Testimony, sec. 27; Russ v. Railroad, 112 Mo. 48; Fullerton v. Fordyce, 144 Mo. 531; State v. Klinger, 46 Mo. 229; State v. Soper, 148 Mo. 235.  The question was further objectionable in

that in asking the opinion of the witnesses as to whether the defendant was capable of judging between right and wrong, the question was not in proper form. State v. Palmer, 161 Mo. 174. (6) The position taken by defendant, that voluntary intoxication is an excuse for crime, has not met with the approval of this court. State v. Harlow, 21 Mo. 446; State v. Deering, 65 Mo. 530; State v. Ramsey, 82 Mo. 133; State v. Duestrow, 137 Mo. 44; State v. Kindred, 148 Mo. 286; State v. West, 157 Mo. 318. Indeed, other respectable authorities have held that instead of intoxication being an excuse for crime, it should be considered as an aggravation thereof. 4 Blackstone's Com., sec. 85; State v. Smith, 49 Conn. 376; State v. Beck, 76 Ga. 453. (7) The complaint that the prosecuting attorney went beyond the bounds of legitimate argument in his closing address can not be sustained for three reasons: First. The remarks were justified by the evidence and the attempted defense. State v. Summar, 143 Mo. 220. Second. The guilt of the defendant was clearly shown. State v. Phillips, 160 Mo. 507. Third. No exception was taken at the time the statements were made. State v. Pagels, 92 Mo. 300; State v. West, 95 Mo. 139. (8) The contention that the court committed error in refusing to give the instructions asked by the defendant on the question of the want of motive of the defendant to commit the crime, is without merit. The evidence in this case was clear and positive. He not only confessed to the officer, but admitted his offense, without equivocation, at the trial. The failure of the State to disclose a motive in a case of purely circumstantial evidence, is the subject of important inquiry. Had circumstantial evidence been relied on by the State, such an instruction, as asked by the defendant, should have been given. But not so here. The evidence was cogent, clear, undisputed and convincing, and in such case no such instruction should be given. Besides the defendant testified that he killed the deceased because she called him a vile

name.   This was the motive.   State v. Foley, 144 Mo.
600; State v. David, 131 Mo. 380; State v. Brown, 168
Mo. 473; State v. Lynn, 169 Mo. 672.

FOX, J.—At the March term, 1902, of the Jackson
County Criminal Court, the prosecuting attorney of
Jackson county filed in said court his information
charging the defendant with murder of the first degree.
The person charged to have been killed was one Laura
Hiblar, the stepdaughter of the defendant, aged about
fourteen years.   The defendant was duly arraigned and
entered his plea of not guilty.

The correctness of the information upon which de-
fendant was tried and convicted is not challenged by the
appellant, hence its insertion in this statement will serve
no needful purpose.

The facts developed in this case are few.   They are
substantially as follows:

The defendant was about the age of forty-five
years at the time of the murder.   His victim was of
about the age of fourteen years.

The domestic relations of the defendant and his wife
were not harmonious.   It appears that the defendant
was frequently given to the use of alcoholic drinks, and
because of this delinquency his wife and himself dis-
agreed and lived apart more than together.   The defend-
ant, however, on the night preceding the tragedy, stayed
at the home of his wife and stepdaughter.   His step-
daughter had been to a party on that night.   The de-
fendant arose earlier on the morning of the tragedy than
his stepdaughter, whom he killed, and requested her
to also arise.   He states that instead of doing this, she
applied to him a vituperative name, "a drunken son-of-
a-bitch," and that, thereupon, and without other cause
he went into the kitchen and procured a large club,
returned to the room where she lay, and struck her a
vicious blow on the head, producing hemorrhage and
death.   He states that she was sitting in the bed at the

time she used the abusive language towards him, and that her face was turned from him. He states that she remained in this position during the interim he was gone after the club, and that he found her thus situated on his return and struck her at a time when her back was towards him.

He gives no motive for the crime, other than that he was beside himself by reason of the language used by his stepdaughter, and he seems to attempt to convey the idea that he was unable to realize the heinousness of his offense, or the effect of what he did.

The defendant testified in his own behalf, and practically admitted all the facts as proven by the State. He details, minutely, all the facts connected with the killing of this fourteen-year-old girl. Says she was in the bed, he told her to get up; that she told him he was a drunken "son-of-a-bitch." He walked deliberately back to the kitchen, secured the stick with which the murder was committed, returned, she was in a sitting posture in bed, without any further conversation he struck the fatal blow, which resulted in her death.

Other witnessses testified as to the defendant's good reputation, as a peaceable and law-abiding citizen. The court gave the following instructions to the jury trying the cause:

"1. The information in this case was filed by the prosecuting attorney on the 11th day of March, 1902, and charged the defendant with murder in the first degree.

"Murder in the first degree is the willful, felonious, deliberate and premeditated killing of a human being with malice aforethought.

"Murder in the second degree has all the elements of murder in the first degree, except that of deliberation.

"As used in these instructions the word willful means intentional, not accidental.

"Felonious means wickedly and against the admonition of the law, unlawfully.

"Deliberately means in a cool state of the blood; it does not mean brooded over, considered, reflected upon for a week, a day or an hour, but it means an intent to kill executed by a party not under the influence of violent passion suddenly aroused by some unlawful provocation, but in the furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful act. And the passion here referred to is that only which is produced by what the law recognizes as a just or lawful cause of provocation.

"Premeditated means thought of beforehand for any length of time, no matter how short the time.

"Malice, as used here, does not mean mere spite or ill-will as generally understood, but signifies an unlawful state of the mind, and such state of the mind as one is in, who intentionally does an unlawful act.

"Aforethought means thought of beforehand.

"In defining the words 'just or lawful' cause of provocation to passion, as used in these instructions, the court instructs the jury that opprobrious epithets or insulting gestures, when applied to a person, constitute a just cause of provocation to passion, and if the person to whom they are applied is thereby aroused to a sudden heat of passion and before such passion has had time to cool, with a deadly weapon kills the person who applies such opprobious epithets or gestures to him, then such killing is done without deliberation and a homicide committed under such circumstances is murder in the second degree.

"The words 'heat of passion,' as used in these instructions, mean a heated state of the blood caused by a lawful or just provocation which deprives the defendant of the power of self-control.

"2. The court instructs the jury that if you find and believe from the evidence that at the county of Jackson and State of Missouri, at any time before the

11th day of March, 1902, the defendant willfully, deliberately, premeditatedly and of his malice aforethought, did with a heavy wooden club, and that the same was a dangerous and deadly weapon, strike, beat, bruise, wound and fracture the skull of one Laura Hiblar, inflicting upon her a mortal wound and fracture, from which said mortal wound and fracture the said Hiblar at the county of Jackson and State of Missouri, then and there instantly died, then you will find the defendant guilty of murder in the first degree and so say in your verdict.

"In that event you have nothing to do with the punishment; that is fixed by law.

"3.   The court instructs the jury that if they fail to find a verdict according to the law, as declared in instruction numbered 2, but shall find and believe from the evidence that at the county of Jackson and State of Missouri, at any time before the 11th day of March, 1902, the defendant willfully, premeditatedly and of his malice aforethought did with a  heavy wooden club, and that the same was a dangerous and deadly weapon, strike, beat, bruise, wound and fracture the skull of one Laura Hiblar, inflicting on her a mortal wound and fracture, from which said mortal wound and fracture the said Laura Hiblar, at the county of Jackson, then and there instantly died, then you will find the defendant guilty of murder in the second degree and assess his punishment at imprisonment in the State penitentiary for any time not less than ten years.

"4.   Manslaughter in the second degree is defined by our law as the killing of a human being without a design to effect death in a heat of passion, but in a cruel and unusual manner, unless it be committed under circumstances as to  constitute excusable or justifiable homicide; and the court instructs the jury that if you believe from the evidence defendant did the killing charged in the information in a heat of passion without a design to effect death, but in a cruel and unusual man-

ner, and not under circumstances which would consti-
tute excusable or justifiable homicide, then you should
find the defendant guilty of manslaughter in the second
degree and so state in your verdict, fixing his punish-
ment at not less than three nor more than five years in
the State penitentiary.

"5.   Manslaughter in the third degree is the kill-
ing of a human being in the heat of passion without a
design to effect death by a dangerous weapon, in any
case, except such wherein the killing of another is ex-
cusable or justifiable, and the court instructs the jury
that if they believe defendant did the killing charged in
the information in a heat of passion without a design to
effect death but with a dangerous weapon and that such
killing was not justifiable or excusable, then you should
find defendant guilty of manslaughter in the third de-
gree, and so say in your verdict, fixing the imprison-
ment at not to exceed three years in the State peniten-
tiary or in the county jail at not less than six months or
by a fine of not less than $500, or by both a fine of not
less than $100 and imprisonment in jail not less than
three months.

"6.   If verbal statements of the defendant have
been proven in this case, you may take them into con-
sideration, with all the other facts, and circumstances
proven.   What the proof may show you, if anything,
that the defendant had said against himself, the law
presumes to be true because against himself, but any-
thing you may believe from the evidence the defendant
said in his own behalf you are not obliged to believe, but
you may treat the same as true or false, just as you be-
lieve it true or false, when considered with a view to
all the other facts and circumstances in the case.

"7.   The court instructs the jury that the law pre-
sumes the innocence and not the guilt of the defendant,
and this presumption of innocence attends the defend-
ant throughout the trial, and at the end entitles the de-
fendant to an acquittal unless the evidence in the case,

when taken as a whole, satisfies you of defendant's guilt beyond a reasonable doubt, as defined in these instructions.

"8.   The court instructs the jury that the defendant is a competent witness in this case, and you must consider his testimony in arriving at your verdict, but in determining what weight and credibility you will give to his testimony in making up your verdict, you may take into consideration, affecting his credibility, his interest in the result of the case, and that he is the accused party on trial, testifying on his own behalf.

"9.   The court instructs the jury that before they can convict the defendant they must be satisfied of his guilt beyond a reasonable doubt; such a doubt to authorize an acquittal upon reasonable doubt, must be a substantial doubt of the defendant's guilt, with a view to all evidence in the case, and not a mere possibility of the defendant's innocence.

"10.   In determining as to the guilt or innocence of the defendant, you should take into account the testimony in relation to his character as a peaceable, quiet citizen and you should give to such testimony such weight as you deem proper; but if, from all the evidence before you, you are satisfied beyond a reasonable doubt, as defined in these instructions, that the defendant is guilty, then his previous good character, if shown, can not justify, excuse, palliate or mitigate the offense, and you can not acquit him merely because you may believe he has been a person of good repute.

"11.   The jury are the sole judges of the credibility of the witnesses, and of the weight and value to be given to their testimony.

"In determining as to the credit you will give to a witness, and the weight and value you will attach to a witness's testimony, you should take into consideration the conduct and appearance of the witness upon the stand, the interest of the witness, if any, in the result of the trial, the motives actuating the witness in testifying,

the witness's relation to or feelings for or against the defendant or the alleged injured party, the probability or improbability of the witness's statements, the opportunity the witness had to observe and to be informed as to matters respecting which such witness gives testimony, and the inclination of the witness to speak truthfully or otherwise as to matters within the knowledge of such witness. All these matters being taken into account, with all the other facts and circumstances given in evidence, it is your province to give to each witness such credit and the testimony of each witness such value and weight as you deem proper.

"If upon a consideration of all the evidence you conclude that any witness has sworn willfully false as to any material matters involved in the trial, you may reject or treat as untrue the whole or any part of such witness's testimony."

The defendant requested the court to give the following instructions, which request was refused:

"1.   The court instructs the jury that the previous good character of the defendant, if proved to your satisfaction, is a fact in the case which you ought to consider, together with all the other facts in evidence in passing upon the question of his guilt or innocence of this charge, viz., murder in the first degree, for the law presumes that a man whose character is good is less likely to commit a crime than one whose character is not good.

"2.   The court instructs the jury that when the evidence fails to show some motive on the part of the defendant to commit the crime charged, viz., murder in the first degree, this is a circumstance in favor of his innocence of that particular crime which the jury should consider, together with all the other evidence in making up their verdict.

"3.   The jury is instructed that, if they believe at the time the defendant did the killing charged that his

mind was so weakened and diseased as to render him incapable of distinguishing between right and wrong of that particular act, then it is immaterial whether this condition of the mind was caused by hereditary disease, injury or any other cause, or resulting from the continued drinking of intoxicating liquors, and if you believe from the evidence that such weakened and diseased condition of the mind was the result of the continued and excessive use of intoxicating liquors it is entitled to the same consideration as a diseased and unsound mind from any other cause and entitles the defendant to an acquittal at your hands.

"6.   Murder in the second degree is in the willful and premeditated killing of a human being with malice aforethought, but without deliberation, and if the jury believe from the evidence that defendant at Independence, in the county of Jackson, and State of Missouri, on or about the 27th day of February, 1902, willfully, premeditatedly, and with malice aforethought, but without deliberation, struck with a club or stick of wood and by striking mortally wounded Laura Hiblar, and that the said Laura Hiblar died of said mortal wound within a year after said striking, then you should find defendant guilty of murder in the second degree, and if you further believe from the evidence that defendant intentionally struck and mortally wounded deceased with a club or stick of wood, and that such club or stick of wood was a deadly weapon, then the law presumes that the killing was murder in the second degree and the jury will so find, assessing the imprisonment of defendant at not less than 10 years in the State penitentiary.

"7.   The court instructs the jury that opprobrious epithets, insulting gestures and the like are held to constitute just provocation in this State, and when the passion or excitement of mind is produced by such provocation, to the extent that it materially interferes with the judgment and reason, an act done at once under its

influence can not in law be said to be done deliberately, and the act can not in law be said to be in a cool state of blood, and if the jury believe from all the evidence in the case that the deceased, Laura Hibler, called defendant 'a drunken son-of-a-bitch,' and that he at once struck her on the head with a club or stick of wood, mortally wounding the said Laura Hiblar, then the jury are instructed that the law presumes such epithet directed to defendant to be an opprobrious one; to·be sufficient provocation to produce a passion or excitement of mind in said defendant, and that such killing was done under its immediate influence and not deliberately or in cool state of the blood, and that defendant is guilty of murder in the second degree.

"8.   The jury are instructed that any fact which will shed light upon the condition of the mind of defendant may be considered, and among other facts any state of drunkenness is a proper subject of inquiry as to what influence such intoxication might have had upon his mind, and if the jury believe that at the time of the killing charged in the information the mind of defendant was so weakened and diseased by the continuous use of intoxicating liquors as to prevent him from understanding the nature and consequence of the act he was about to commit, and such diseased and weakened condition of his mind was inconsistent with deliberation, the jury must find the defendant guilty of murder in the second degree, and so state in your verdict.

"9.   The court instructs the jury that if they believe from the evidence defendant to be guilty of either degree of murder, but entertain a doubt as to the degree, you should give the defendant the benefit of the doubt and find him guilty of murder in the second degree.

"10.   The jury are instructed that from the simple act of killing with a deadly weapon the law presumes it to be murder in the second degree.   If the defendant

State v. Brown.

intentionally killed Laura Hiblar by striking her on the head with a club or stick of wood, then the law presumes the defendant guilty of murder in the second degree in the absence of proof to the contrary.

"11.   The jury are instructed that before you can find defendant guilty of murder in the first degree it is necessary for the State to prove every element of that crime beyond a reasonable doubt, that is, there must be proved not only that the defendant killed Laura Hiblar, but that when he did kill her he intended to do so; that he killed her premeditatedly, that is, he thought of killing her before he did so; that he killed her deliberately, that is, in a cool state of the blood, not brooded over or reflected upon for a week or day or an hour but with an intention to kill or in the furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose, and not under the influence of a violent passion suddenly aroused by just provocation, and that if the State fails to prove any of these elements beyond a reasonable doubt you can not find defendant guilty of murder in the first degree.''

This cause being submitted to the jury, they returned a verdict of guilty of murder in the first degree. Motions for new trial and in arrest were filed, and by the court overruled, and defendant, in proper time and form, prosecuted his appeal from the judgment upon the verdict, and it is now before us for review.

Numerous errors are assigned by appellant, in the trial of the cause, and we will dispose of them in the order indicated by counsel for appellant.

It is insisted that the examination of the jurors upon their *voir dire* by the prosecuting attorney, was erroneous and prejudicial to the rights of the defendant.

The examination complained of was substantially as follows: "Gentlemen, this question is addressed to the last three gentlemen called and sworn.   This case is

against James Brown, the man who sits here at this table. The information charges him with murder in the first degree. It is alleged in the information that this killing took place on the 27th day of February of this year. That the deceased's name was Laura Hiblar, and that the killing was effected with a heavy club. The evidence in the case will tend to show that the deceased, Laura Hiblar, a girl about fourteen years old, was the stepdaughter of this defendant, and that the killing took place on the early morning of February 27th, and that Laura Hiblar was killed while sleeping in her bed.''

To this method of examination, defendant objected and his objection was properly sustained. We are unable to see how this examination could operate to the prejudice of the defendant. It will be conceded it was not the usual and ordinary way of testing the competency of a juror, and it may be conceded that it was not the proper way; still the record shows that the court did not permit the examination along that line, and furthermore, the statement to the jurors was nothing more than the prosecuting officer would make to the panel of jurors who would finally be selected to try the cause. If the statement of the prosecuting attorney as to what the State expected to prove, upon the opening of the case to the jury, would not be regarded as prejudicial to defendant's rights, we are unable to discern how a similar statement before they are selected could have the effect of endangering a fair trial. This contention is without merit, and must be ruled against the appellant.

It is next urged that the court erroneously excluded evidence offered as to how the defendant acted when drunk, and as to his being drunk the night before.

This being a serious, as well as a very important case, we have read, with a marked degree of care, every sentence of testimony disclosed by the record. No one can read it and discover even the pretense of the de-

fense to insanity, by reason of continued intoxication. While there is testimony tending to show that defendant was frequently intoxicated, yet this falls·far short of any such use of intoxicants as would result in insanity. Hence this second contention must be predicated upon the position that evidence of voluntary drunkenness is admissible, and at least tends to mitigate or reduce the grade of the offense.

Whatever may be the ruling of appellate courts in other jurisdictions upon this question, the unbroken line of decisions in this State, and the uniform expression upon this subject, does not leave it an open question as to whether voluntary drunkenness is admissible in evidence, or mitigate the offense charged. In State v. West, 157 Mo. l. c. 318, the following instructions were given to the jury: ·

"3. The court instructs the jury that drunkenness, in any degree, can not justify, excuse or mitigate the commission of a crime, and if the jury believe from the evidence that the defendant did, with one Eli J. Stubblefield, stop, detain and arrest the progress of the Lexington branch train on the Missouri Pacific railroad as described and defined in instruction number one, on behalf of the State, with intent to commit robbery thereon, they should find the defendant, James L. West, guilty; and the fact that defendant may have been drunk to any degree at the time can not be taken into consideration by the jury in making up their verdict.

"4. The court instructs the jury that in making up their verdict, they will entirely disregard all the testimony with reference to the defendant being drunk, and that drunkenness can not be pleaded in excuse, mitigation or defense of any crime."

These instructions were directly in judgment .before the court, and in disposing of them the court said: "The unbroken line of decisions in this State is that voluntary intoxication at the time the criminal act is committed constitutes no excuse therefor. [State v.

Harlow, 21 Mo. 446; State v. Dearing, 65 Mo. 530; State v. Ramsey, 82 Mo. 133; State v. Duestrow, 137 Mo. 44; State v. Kindred, 148 Mo. l. c. 286.] There was no error in giving these instructions or refusing instruction numbered 23 prayed by defendant, as it is apparent the latter referred to defendant's condition as one of intoxication."

To hold that it was error to exclude testimony "as to how the defendant acted when drunk, or that he was drunk the night before," would be an absolute abandonment of the unqualified expressions of this court from the case of State v. Harlow, 21 Mo. 446, down to the case of State v. West, 157 Mo. 318. This we are unwilling to do.

The prosecuting attorney, upon cross-examination of appellant, asked him respecting "a hatchet he had the night before the killing." The defendant, upon his examination in chief, had not referred to a hatchet, and the court, upon its own motion, refused to permit this question to be answered. Could the court have done more? We think not. The mere asking of the question did not constitute error; if such was the rule, we apprehend that few cases would be properly tried.

Witness Woodson testified as to the good reputation of defendant; upon cross-examination, in order to test his means of knowledge of the reputation of the appellant, he was asked specially if he had not heard of a previous assault on the deceased. This was objected to, and is urged as error. This is not a new point, presented to this court for the first time. In State v. Crow, 107 Mo. l. c. 345, the following recital shows clearly the question presented in that case:

"G. W. Woodruff testified, as a witness in behalf of defendant, that the general reputation of defendant for honesty was good. On cross-examination the witness was asked, and permitted to answer, over defendant's objection, if he had not heard of the defendant being indicted for stealing other cattle, previous to this,

and if he had not heard that the defendant had been charged with violating the revenue laws and selling whiskey without license. Witness answered affirmatively to each question, stating that he had also heard that he had been acquitted of the charge of stealing cattle. The ruling of the court in admitting this testimony is assigned as error. The exact question, so far as we are advised, has never been passed upon by this court and merits careful consideration.''

We have, in that case, the identical proposition involved in this contention, and after a careful and thorough consideration of the question, this court ruled that the cross-examination, as herein indicated, was permissible and in strict accord with the rules applicable to cross-examination of witnesses.

To the same effect is the case of State v. McLaughlin, 149 Mo. l. c. 32 and 33, where it was said: ''A point is made in the cross-examination of the witness Arms, who testified that Dunham's reputation for truth was good at Nettleton. On cross-examination he stated he had never heard anything against Dunham. He was asked if he had never heard Dunham kept an unlawful dive in Breckenridge. He answered he had, and that he had heard he was selling liquor illegally. He was asked if he had not heard of various other disreputable transactions of Dunham's, and he answered that he had heard of some, and had not of others. The objection to this cross-examination was that it was incompetent and irrelevant, an objection insufficient if the evidence is admissible for any purpose. But it is settled law that when a witness is called to sustain or attack the reputation of another witness, the opposite party may cross-examine him liberally as to his means of knowledge, and test his own truthfulness, and it is largely a matter of discretion with the court how far such an examination will be allowed. We think it would be an unwise exercise of our appellate jurisdiction to reverse a cause on this showing alone.''

It is insisted that the court erroneously refused to permit Dr. Sheling, a witness on the part of defendant, to answer the question propounded to him. The question propounded to Dr. Sheling, was as follows: ''Doctor, I will ask you this question: Where a man, raised in a tropical climate, his father is a drunkard and at the age of forty years comes to this country; he is a drunkard himself, drinks constantly and when in a drunken condition or stupor, I will ask you, Doctor, whether that man, at the time, knew the difference between right and wrong?''

The court was clearly right in sustaining· the objection of the State to this question. Hypothetical questions must be based upon the facts, which the evidence tends to prove. The record in this case fails to disclose that the father of the defendant was a drunkard. It fails to show a constant and continuous state of intoxication, on the part of the defendant. It fails to show that he was in a drunken stupor at the time he killed Laura Hiblar. [Fullerton v. Fordyce, 144 Mo. l. c. 531; Russ v. Railroad, 112 Mo. 48; State v. Soper, 148 Mo. 235; Rogers, Ex parte Testimony, sec. 27.]

There was also another error, fatal to the correctness of this contention, which is made apparent from the question propounded Dr. Sheling. It seeks to have him announce his opinion, as to whether the defendant, under certain conditions, ''knew right from wrong.'' This court very aptly stated the rule in respect to this question, in State v. Palmer, 161 Mo. l. c. 174. It was ruled: '' An expert witness can not be asked his opinion as to whether the accused was capable of judging between right and wrong. [Shults v. State, 37 Neb. 497; Reg. v. Layton, 4 Cox C. C. 149.] Nor to express an opinion that the accused acted under an insane delusion or was impelled by an irrepressible impulse. [Patterson v. State, 86 Ga. 70.] And an expert witness may give his opinion as to the state of mind of the accused, but not as to his responsibility, that being

a question for the jury. [Reg. v. Richards, 1 Fost. & F. 87; Reg. v. Burton, 3 Fost. & F. 772; People v. Thurston, 2 Park. Crim. Rep. 49; 1 Clevenger's Med. Jurispru. of Insan., 585, 586.]'' It is also insisted that the court erred in excluding the answer to the question to defendant, while on the stand, as to whether the deceased had not prior to the morning of the killing called him a "son-of-a-bitch." There was no error in the action of the court in excluding this testimony. The language of the deceased addressed to the defendant, prior to the killing, was, beyond dispute, incompetent. What she may have said to him on a prior occasion, neither justified nor mitigated the offense. Opprobrious epithets of the character offered in the proof, are admissible at the time of the commission of the act, on account of their tendency to arouse such a heat of passion as might reduce the killing from murder in the first degree to murder in the second degree. This is the only ground upon which such language becomes important and admissible. Hence, it is clear that the use of this language on other occasions, independent and separate from the time the fatal act was committed, are not admissible, for the reason that it can not be made the basis for arousing such heat of pasion, in the doing of an act subsequent to the application of the language, to the person committing said act.

There was no error in refusing to allow defendant to inquire into the details of his arrest for disturbance of the peace, which was incidentally brought out on cross-examination of defendant's witnesses, in respect to his good reputation. This testimony did not tend to prove or disprove any of the issues involved in this trial, and therefore was properly excluded.

This leads us to the consideration of the refused instructions requested by appellant.

Instruction numbered 1, requested by appellant, was applicable to the testimony introduced by defendant, upon the subject of good character. The law was.

fully and correctly declared by the court, in instruction 10. Hence, there was no necessity for a repetition of it. The instruction given as to good character fully covered the subject and that was all the defendant had a right to demand. This instruction was properly refused.

Instruction 2 requested by defendant and refused by the court, was upon the subject of the motive which induced the defendant to do the act charged. Upon the undisputed facts of this case, which are fully disclosed by the record, the action of the court, in refusing this instruction, was clearly right. Instructions by the court to the jury should be predicated upon the facts; there should be a reason or purpose in every declaration of law, and that is to guide the jury in the proper discharge of their duty. In this case, there is no doubt surrounding the perpetration of this crime or the manner in which the killing was done, and the defendant testifying in his own behalf, furnishes the only reason and motive for the commission of the act; that was, that the deceased applied to him the epithet that he was a "drunken son-of-a-bitch." In cases where the killing is denied, and the proof of that fact depends upon circumstances, or where the defense is made that the killing was purely an accident, it is apparent that the inquiry as to the motive is important, and in cases of that character the instruction requested is appropriate and should always be given.

In State v. Foley, 144 Mo. 620, the defendant requested the following instruction, which was refused:

"The court instructs the jury that the absence of any probable motive for the commission of the crime charged in the indictment, is a circumstance which must be considered in favor of the defendant."

In the course of the opinion in that case, the court indicates very clearly the class of cases to which such an instruction is applicable. GANTT, J., speaking for th ecourt, says:

"The only question that can arise on this part of the case is as to the failure of the court to give defendant's instruction as above set out. While perhaps somewhat objectionable in form, it was certainly a sufficient request to charge on that subject, if defendant was entitled to an instruction embodying the principle enunciated. We had occasion in State v. David, 131 Mo. 380, to consider how far the existence or absence of a motive affected the prosecution of a crime, and we held that it did not devolve upon the State in any case to prove a motive for the commission of a crime whether the agency of the defendant in the commission of the crime was established by direct or circumstantial evidence, but we held that the fact of a motive or the failure to disclose any motive in a case of purely circumstantial evidence was always an important inquiry, and the subject of legitimate argument.''

In State v. Lynn, 169 Mo. 673, this court very clearly announced the rule in respect to instructions on the subject of motive. It was said by this court:

"The point is made that the court erred in refusing an instruction asked by defendant, numbered 1, which told the jury that in case they failed to find any motive on part of the defendant for the commission of the crime charged against him, then this ought to be considered with the other evidence in making up their verdict. There was no error in refusing this instruction. There was nothing upon which to predicate it. Defendant admitted the killing and testified that he shot deceased in self-defense, and to save his own life. This, according to defendant's own testimony, furnished the motive for the homicide.''

To the same effect is State v. Brown, 168 Mo. l. c. 473. SHERWOOD, J., in that case, said:

"An instruction was asked by defendant, and refused by the court, which reads this way: 'The jury are instructed that when the evidence fails to show any probable motive to commit the crime charged, on the part

of the accused, this is a circumstance in favor of his innocence, and in this case, if the jury find, upon careful examination of all the evidence, that it fails to show any probable motive, on the part of the accused, to commit the crime charged against him, then this is a circumstance which the jury ought to consider in connection with all the other evidence in the case, in making up their verdict.'

"This instruction was properly refused because a man is not to be acquitted of crime simply because his motive for perpetrating it can not be discovered."

So it was said by this court in State v. Evans, 158 Mo. l. c. 609:

"Where it is doubtful as to the motive of a crime, the court may properly instruct the jury that if they find the defendant guilty as charged in the indictment, it is their duty to so find in their verdict, whether the motive for the crime be apparent or not, but when the evidence fails to disclose a motive for the crime, this is a circumstance in favor of the innocence of the defendant which they should consider together with all the evidence in the case."

That is not this case. It certainly will not be contended that any doubt surrounded this killing or how it was accomplished. The defendant, under oath, details minutely how this terrible crime was committed. He says that Laura Hiblar was in bed; that he told her to get up. She then called him a vile name, heretofore mentioned. Upon applying this epithet to him, he deliberately turned round, went into the kitchen, secured a stick, returned and killed her. Under this state of facts, was there any necessity, or did the defendant have a right to demand that the court submit to the consideration of the jury his motive in doing the act? We think not.

Our attention is directed to the insistence in the reply brief of appellant, in which it is contended that the instruction upon the subject of motive should have

been given. Otherwise, if the application of the opprobrious epithet furnished the motive, then the jury should have only convicted the defendant of murder of the second degree. We will say as to this contention that the vile language may have furnished the motive; yet the nature and character of the provocation was a matter for the consideration of the jury, and it was for them, after a fair and impartial consideration of the language used by the fourteen-year-old girl, to determine whether it was reasonably calculated to reduce the killing, under its immediate influence, to murder in the second degree. It may also be said that it was specially the province of the jury, from all the facts surrounding the killing, to say whether such a heat of passion was in fact engendered by the use of the language.

Instruction numbered 3, requested by appellant, and refused by the court, was a declaration submitting to the consideration of the jury the question of defendant's sanity at the time of the commission of the offense. No one can read the record in this cause and escape the conclusion that there is absolutely no evidence upon which to predicate such an instruction. The mere fact that he frequently became intoxicated falls far short of furnishing a basis for such a declaration. There is an entire absence of any substantial evidence showing insanity; on the other hand, the testimony indicates clearly that he was in the possession of all his mental faculties and fully comprehended the act he was committing.

Instruction 6, refused by the court, relates to murder of the second degree; it is sufficient to say that the court, by instruction numbered 3, fully covered that grade of the offense. The instruction given was in strict accord with approved precedents, and there was no error in the refusal of the one offered by appellant.

Instruction numbered 7, refused by the court, relates to the subject of opprobrious epithets, and under

what conditions, when applied to a person and he, suddenly, in heat of passion, kills the victim applying the opprobrious words, the offense would be reduced from murder in the first to murder in the second degree. It will be observed, upon an examination of instruction 1, given by the court in this cause, in defining "just or lawful" cause of provocation, the court, in plain and unambiguous terms, told the jury substantially what the appellant requested in the refused instruction. There was no reason for repeating it, and the refusal to give the instruction was proper.

The request to give instruction numbered 8 was properly refused. It tells the jury that if they believe from the evidence that defendant's mind was so weakened and diseased from the continued use of intoxicating drinks as would prevent him from deliberating about the act he committed, then they should find him guilty of murder of the second degree. There is an entire absence of any testimony indicating a weakened or diseased mind, on the part of the defendant, and none which undertakes to show the extent of his use of intoxicants, and the effect it produced upon his mental faculties. Hence, there was no testimony upon which to base the refused instruction. As to the consideration of voluntary drunkenness, that proposition is disposed of in the discussion of the exclusion of evidence as to such fact.

Instruction numbered 11, refused, simply requires the jury to find all the elements constituting murder in the first degree, before they will be authorized in convicting the defendant of that grade of the offense. This requirement was fully covered by instructions numbered 2, 7, and 9, given by the court.

We have thus carefully considered the instructions refused, upon which appellant bases his assignment of error, in respect thereto, and find no error in the action of the trial court, in refusing to give them.

This leads us to the consideration of the error complained of as to the remarks of the prosecuting attorney in his address to the jury.   While we feel that the interest of the State can be fully protected by a legitimate and appropriate discussion of the facts developed in the case, yet errors of this character are no exception to the rule; they must be properly preserved in the record, before the appellate court can be called upon to review them.

To the first remarks there was an objection, but the record is absolutely silent as to any exception to the action of the court in its failure to stop that line of argument and reprimand the State's officer.   The last remarks passed unnoticed, until the jury had retired.

We find that the court requested, as to the first remarks, that appellant save his exception, yet the record fails to disclose that even this request was heeded.

The closing remarks, which nearest approached reversible error, were not objected to until after the cause was submitted to the jury.

While we do not wish to be understood as sanctioning the remarks complained of, the facts in the case and the heinousness of the crime committed often furnish a zealous prosecuting attorney at least a partial excuse for the use of denunciatory terms, in discussing it.   Here we have an ablebodied man, in the prime of his manhood, according to his own testimony, killing a defenseless little girl, for the reason only that she applied to him an opprobrious epithet.   The horrors of this deed are emphasized by the fact that he did not act suddenly upon the application of the vile language; but, cool and collected, he returns to the kitchen, secures cures his weapon and destroys his victim.

Gantt, J., in State v. Summar, 143 Mo. l. c. 234, in discussing a contention as to improper remarks made by counsel, said:

"It would appear that Judge Abbe, special counsel

for the State, in discussing the effort to impeach the girl, used words substantially to this effect: 'A defendant who has ruined the character of a girl, and taken from her the most precious gem, who will come into court and try and take advantage of his own wrong, is an infamous scoundrel.' This is strong language but we agree with the learned counsel that if the defendant did debauch this girl who bore the relation of a niece by marriage, and was the father of her illegitimate offspring, and her character for chastity was thereby destroyed among her neighbors and when she appeared as a witness against him, sought to destroy her evidence by proving she had a bad reputation for chastity, we know of no language more befitting his conduct, or descriptive of his character than that used by counsel.''

BURGESS, J., in State v. Phillips, 160 Mo. l. c. 507, very forcibly announced the views of this court upon the question being discussed.    He said:

''That the remarks of the prosecuting attorney in addressing the jury, were beyond the bounds of legitimate argument, and should not have been permitted, is without question, and if the case were a close one, or there was any doubt in our minds as to defendant's guilt, we should not hesitate to reverse the judgment upon that ground alone, but as defendant's guilt was conclusively shown, we must decline to do so.''

This case should not and will not be reversed upon the ground of such remarks by the prosecuting officer.

While they are not discussed in the briefs before us, the record in the cause discloses other questions, which we deem at least of sufficient importance to discuss and give expression to the views of this court upon them.    The first one to which our attention is attracted is the effect of the motion in arrest of judgment ''because the verdict is insufficient to sustain the judgment.''    Is this definite and specific enough to require us to pass upon the sufficiency of the information, and,

if so, is the fact that the information was not verified by the affidavit of the prosecuting attorney, or some witness competent to testify in the case, *fatal* to the judgment and sentence, *when raised for the first time in a motion in arrest of judgment?*

In State v. Bonner, 178 Mo. 424, decided by this court on the 9th of December, we held that since the Act of 1901 (Laws of Missouri, 1901, pages 138 and 139) informations in felony cases must be verified by the affidavit of the prosecuting attorney or some person competent to testify as a witness in such case, or supported by the affidavit of such person. As informations were required to be verified by section 2477, Revised Statutes 1899, in misdemeanors, if the defendant assailed an information not thus verified by a timely motion to quash, and such motion was overruled and exception duly saved, it constituted reversible error. No other conclusion was possible unless the statute was to be utterly ignored. In that case, it was pointed out that by the amendment to the Constitution adopted by the people of this State, November 8, 1900, *indictments and informations* became concurrent methods for the prosecution of felonies; that prior to that time, felonies could only be prosecuted by indictments by a grand jury. Soon after the adoption of this amendment, the question arose as to whether it was self-enforcing, and *when* it went into effect. In State v. Kyle, 166 Mo. 287, this court in Banc held that the amendment was self-enforcing and took effect from the time of the canvass of the vote on said amendment ascertaining its adoption, to-wit, December 19, 1900.

The Kyle case was commenced by the filing of an information by the prosecuting attorney of Moniteau county, in January, 1901, and prior to any legislation regulating the mode of proceeding by information *in felony cases.*

The information in that case was assailed because *not verified* by the prosecuting attorney nor sworn to

by any person competent to testify in the case, but it was held by the court in Banc that *in the absence of a statute prescribing the mode and form of information in felony cases* resort must be had to the common law to determine the sufficiency of the information, and as, at common law, the Attorney-General or circuit attorney could present an information on his official oath of office without further verification, the information in the Kyle case was sufficient.

Thereafter at the regular session of the Legislature, in 1901, and on the 13th of March, 1901, the General Assembly proceeded to adjust the statute on the subject of prosecutions by information to the new order of things, and accordingly, article 3 of chapter 16, Revised Statutes 1899, was amended by inserting in section 2476, Revised Statutes 1899, after the word "indictment" the words *"or information,"* so as to make that section read, "All felonies shall be prosecuted by indictment or *information,* except," etc.

At the same time section 2478 was also amended by striking out the word "misdemeanor" therein and inserting in lieu thereof the word "crime," so as to include all grades of crime, whether felonies or misdemeanors. Thus amended, by the act of March 13, 1901, it is obvious that the Revised Statutes of 1899, article 3 of chapter 16, thereafter provided for the prosecution of felonies *by information,* as well as misdemeanors, and section 2477 of said amended article *specifically required that informations should be verified by the oath* of the prosecuting attorney, or some person competent to testify in the case, or be supported by the affidavit of such person. It was pointed out in the Bonner case that, when the Kyle case arose, there was no statutory method of procedure by information in felony cases provided, but that when the Bonner case originated, the statute had been amended, and a specific method provided and that this statutory method super-

seded the common law mode, and as the defendant in the Bonner case challenged the information *by a timely motion to quash* the information, because not verified as the statute required, and as the circuit court overruled that motion and the exception was duly saved, it was held to be reversible error.

The Bonner case is the first one in this court in which the act of 1901 was called to the attention of this court on an exception saved to a refusal to quash an information on the ground that it was not verified as required by statute, sections 2477 and 2478, Revised Statutes 1899, as amended by the Act of March 13, 1901. Prior thereto, the case of State v. Jones, 168 Mo. 398, had been heard and determined. In that case *no motion to quash* was filled and the defendant went to trial and after his conviction, *in his motion in arrest of judgment, he, for the first time, made the point* "that said information is not verified according to law." The learned counsel for defendant, in that case, did not press the point in their brief, but as it was the first time the statute requiring informations in felony cases to be verified had come before us, in the opinion by GANTT, J., it was held that the verification which was in the following form, was sufficient:

"K. C. Spence, prosecuting attorney within and for the county of Stoddard in the State of Missouri, being duly sworn according to law, upon his oath does selemnly swear and state that the facts set out in the above information are true to his best knowledge.

"K. C. SPENCE, Prosecuting Attorney.

"Subscribed and sworn to before me this, the 29th day of July, 1901.

"T. H. EZZELL, Circuit Clerk."

"It will be observed," said the court in that case, "that the information on its face disclosed it was made on the official oath of the prosecuting attorney *upon his information and belief,* which the statute expressly

permits. [Section 2478 [2477], R. S. 1899, Amended, Laws of 1901, p. 139.]"

By reference to section 2477, Revised Statutes 1899, it will be noted that *when the prosecuting attorney makes the affidavit it "may be upon information and belief."* Hence, when it was said in State v. Jones, 168 Mo. 398, that "the information was made upon the *official* oath of the prosecuting attorney, *upon his information and belief, which the statute permits,"* and reference made to the statute *as amended,* and when, in the report of the case in 68 S. W. 566, the affidavit was set out in full and in 168 Mo. 398, the official report says "omitting the formal parts and affidavit," it clearly appears that there was an affidavit, and it is plain that the profession was advised that the information in that case was *verified* by the affidavit of the prosecuting attorney in the form allowed when he *officially makes it,* and that so verified, the information was sufficient, but as the case was reversed, on another ground, no elaborate discussion was indulged in. In the Jones case, an entirely sufficient affidavit was made, and it was so held, and a motion to quash should have been denied, if made.

This statute was next invoked in the case of State v. Pohl, 170 Mo. 422. Not only was the amendment of March 13, 1901, not called to the attention of this court and to the judge who wrote the opinion, by either the counsel for defendant or the Attorney-General, in the briefs filed, but in the brief of the Attorney-General, the court was expressly informed that no change in the statute had occurred since the opinion in State v. Kyle, 166 Mo. 287, and hence that no affidavit was necessary, and in this way Judge BURGESS was misled to cite the Kyle case as authority that no verification was needed. But, in that case, there was, in fact, an affidavit filed of one Baumgartner with the prosecuting attorney, and this affidavit and the information were filed together

at the commencement of the prosecution, and the judgment was correct.

In Pohl's case, no motion to quash was filed, and no exception saved, but the point as to the affidavit of Baumgartner was saved in the motion in arrest *for the first time,* and then only on the grounds that the information was insufficient to require defendant to be put on his plea and because it charged no crime known to the law, and nowhere in it was the failure to verify the information, as required by section 2477, made a ground for arresting the judgment.

So that case was properly decided on the record before us, and the point was never properly presented to the trial court by a motion to quash.    [State v. Hicks, 178 Mo. 433.]

We have thus reviewed the foregoing cases to show that in truth and in fact, the Bonner case is the only case, so far, in which our attention has been called, by a motion to quash, to the failure of the prosecuting attorney to verify his information by the affidavit either of himself or some competent witness.   We are moved to examine the point in this case because the information herein is not verified in either of the ways provided, though no objection was made by motion to quash in the criminal court, nor has the point been raised by counsel, but as it is our duty to examine the record in a criminal case to see whether prejudicial error has been committed against the defendant, and as the consequences are so serious, we now proceed to inquire *whether the failure* to verify an information by the affidavit of the prosecuting attorney or some competent witness *is fatal when the same is not challenged by a motion to quash.*

At a very early day in our judicial history, the distinction was drawn between those errors for which a motion to quash an indictment would be sustained, and those necessary to arrest a judgment.   Thus in State v. Mertens, 14 Mo. 95, it was ruled that it was too late

after a defendant had been tried upon an indictment which had not been certified to be a true bill and signed by the foreman of the grand jury, as required by the statute of this State, to raise such an objection for the first time by a motion in arrest of judgment. [State v. Clark, 18 Mo. 432.]

But in State v. Burgess, 24 Mo. 381, Judge LEONARD, while adhering to the rule announced in the Mertens and Clark cases, supra, said that *when a motion to quash the indictment was timely lodged*, at a preliminary stage of the proceedings, it presented an altogether different question, and held that the circuit court properly quashed an indictment not indorsed a true bill by the foreman of the grand jury.

In Wharton's Criminal Law, p. 863, it is laid down that there are several points in which an indictment is cured by verdict and in which the errors, which might have been taken advantage of at a previous stage, are not sufficient to arrest judgment. "Thus, while duplicity is fatal on motion to quash or demurrer, the better opinion is, that it will not be ground for arrest, and the same position is undoubtedly good when there has been a misjoinder of counts, but where the defendant has gone to trial without a motion to quash or an application for election. The practice also is not to arrest judgment on the ground of irregularity in the summoning or the procedure of the grand jury, and it is clear that if misnomer of the defendant be not met by a plea in abatement, it is too late for further objection after trial."

In State v. Nugent, 71 Mo. 136, a statute then and now in force, required the names of witnesses to be indorsed on the indictment, and this statute was enacted for the just and wise purpose of giving the accused an opportunity of knowing who were his accusers, that he might prepare to meet their evidence, but in that case defendant made no motion to quash, but after trial raised the point by motion and it was held too late.

In State v. Smallwood, 68 Mo. 194, it was ruled that an objection in a motion in arrest, that the record did not show that a grand jury was impaneled and sworn, could not be considered, as it came too late after verdict.

In 10 Ency. Plead. and Practice, 564, the law is summarized as follows: "Exceptions to an indictment or information must usually be made before trial on the general issue. If they are formal, or such as may arise upon demurrer, plea in abatement, or *motion to quash,* they must generally be made and adjudicated preliminary to the trial and if not thus made, they will, in contemplation of law, be waived, unless no offense within the jurisdiction of the court is stated, such a defect being fatal at any stage, and not being waived by failure to take advantage thereof at any preliminary stage of the proceedings."

With us in Missouri, the foregoing statement is too broad, and even after verdict and when no assault has been made by demurrer, motion to quash or in arrest, and for the first time, an indictment may be held bad on objection in this court on its own inspection of the record, if it is deficient in substance or fails to sufficiently advise the defendant of the nature and cause of accusation against him.

In this connection, our statute of jeofails has pointed out various defects for which a judgment or sentence shall not be stayed: defects which do not "tend to the prejudice of the substantial rights of the defendant upon the merits." [Sec. 2535, R. S. 1899.]

In State v. Foster, 61 Mo. 549, the objection was that instead of the words "State of Missouri," the indictment used the words "State of Mo.," and while the Constitution required all writs and process to be in the name of the State of Missouri, it was held to be an immaterial error after verdict.

This brings us now to the information before us. As already observed, the motion assigns as error only

that "the verdict is insufficient to sustain the judgment." Section 2692, Revised Statutes 1899, provides, that "the motion in arrest shall be in writing and specify the causes therefor."

In State v. Berry, 62 Mo. 595, a motion in the general form thus used was deemed not specific enough. [See, also, State v. Van Houten, 37 Mo. 358.]

Of course, where the indictment or information is fatally defective, such an objection is good, and expressly made so by sections 2690 and 2691, Revised Statutes 1899. But we are now dealing with formal defects. We are clear that the objection that the verdict would not sustain the judgment, even if timely made, would not have raised the defect in the failure to verify the information, because no such ground was specified. Did then, the failure to verify the information render it so defective that a motion in arrest would reach it, or is it such that this court should arrest it even without motion? That it was filed in a court having jurisdiction to try felonies is plain; that it was preferred by the officer authorized by law to prefer informations in his own right is indisputable; that it fully charges the crime of murder, particularly and in substance, is not open to question. The only defect, then, is the failure to verify it by the oath of the prosecuting attorney, or some competent witness. What, then, was the purpose of requiring the information to be verified? It was not to confer jurisdiction on the criminal courts to try cases of felony. That was conferred by the Constitution and laws of the State creating those courts. It was not to define what should constitute a sufficient charge in the information, because that also was prescribed in the Bill of Rights, and the long-established practice as to the essentials of a good indictment. The statute on its face shows that the verification is something additional to and *dehors* the body of the information itself, and which would not and could not make the information good if otherwise defective in substance.

That it is no part of the information itself is apparent from the fact that the affidavit may be made by a witness and filed with the prosecuting attorney, a thing separate and apart from the information, and something additional thereto. Its purpose was to afford the defendant a guaranty of the good faith of the prosecution and to prevent a careless and reckless prosecution of a citizen. It is, then, not a part of the information, but a step directed to be taken in aid of it. A motion in arrest goes only to defects appearing on the face of the indictment or information, and not to an affidavit upon which it may be based, or which merely verifies the charges in the information. This we regard as essential and in harmony with our deceisions on analogous questions. The jurisdiction of the court does not depend on the affidavit, neither is the sufficiency of the information affected by it.

The filing of the affidavit or verification is but an additional step directed by the statute, which the defendant may or may not waive. If he does not waive it, the proceeding should be quashed on motion, unless amended by leave, as permitted by the statute, section 2481, but if he omits to challenge it by motion to quash, it is too late to raise it by a motion in arrest.

As the information is not sworn to, if the defendant did not desire to go to trial upon an information not sworn to, he should have made his motion to quash the proceeding, but a failure to do so in no manner affected the jurisdiction of the court, as was ruled in habeas corpus in In re Lewis, 31 Kan. 71. In a word, the failure to verify the information as the statute, section 2477, Revised Statutes 1899, requires, is an irregularity in failing to adhere to the mandate of the statute, which we held in State v. Bonner could be reached by a motion to quash, and if that motion were overruled, by an exception saved, followed up by a motion in arrest; but we are clear, that where, as in this case, no motion to quash was filed, the defect now being considered is not

available to defendant by motion in arrest, even if his motion had specified that the information was not verified. The distinction we have drawn we think is so plain that counsel in criminal cases will have no difficulty whatever in conforming to them. We hold, as we did in the Bonner case, that the statute, as amended in 1901, requires informations to be verified, and should in all cases be followed, as we think it generally has been, but if no advantage is taken of such failure by motion to quash, it is waived and an objection on that ground comes too late after verdict.

But again, no contention has been made on this appeal that the circuit court erred in overruling the special demurrer of the defendant, wherein the defendant assailed the information "because the same was not verified by the oath of any prosecuting attorney of said county or by the oath of some person competent to testify as a witness in the case, or supported by the affidavit of such person." This demurrer was overruled and thereupon the defendant voluntarily entered his plea of not guilty.

Two questions present themselves on this state of the record. We have already ruled that the motion in arrest, confined as it was to the one specification that "the verdict was insufficient to sustain the judgment," did not reach the defect of a failure to verify the information.

First. Was this failure such an error as could be reached by a demurrer? We think not. The demurrer goes to the sufficiency of the pleadings. The information was sufficient and was not challenged for any failure in the subject-matter thereof, or the jurisdiction of the court, but was assailed because of the failure to support it by affidavit, a matter *dehors* the information, an additional step outside of the information itself and which could and should have been reached by a timely motion to quash, as was ruled in State v. Bonner.

As already said, the purpose of the verification is to secure good faith in the institution of the proceedings and to guard against groundless and vindictive prosecutions, and is not a constitutive part of the information, but an extraneous paper in support thereof. A failure to verify may be waived, just as a failure to indorse the witnesses on the indictment may be waived. Each requirement is for the benefit of the accused, but if he sees fit to waive it, such an objection comes too late after verdict. It is similar to those made for a failure to furnish the defendant with a copy of the indictment the requisite number of hours before arraignment, or the list of jurors after the panel is obtained, both of which are waived if advantage is not taken at the proper time. [State v. Klinger, 46 Mo. 224; State v. Green, 66 Mo. 631.] These are not matters to be reached by demurrer. [State v. Brandon, 28 Ark. 410.]

While in some jurisdictions the motion to quash, like a demurrer, goes only to matters appearing on the face of the indictment, with us in Missouri, it has been ruled from an early day that indictments may be quashed for causes not appearing on their face. [State v. Wall, 15 Mo. 149; State v. Batchelor, 15 Mo. 149; 1 Chitty's Crim. Law, 319 and 440, and note.]

While we are clear that this is not such a defect as could be reached by demurrer, yet at common law the right of a defendant to plead over after his demurrer was overruled, was involved in much doubt, but the general doctrine was that in felonies he was not precluded from pleading over, but owing to these doubts, this mode of exception fell into disuse because the prisoner could have all the advantage he could possibly obtain in this way by his motion in arrest after taking the chance of a complete acquittal.

Defendant in this case not only has not saved his objections in a motion to quash, duly preserved in a bill of exceptions, and renewed in his motion in arrest, but

contented himself with raising the point in a demurrer. Our conclusion, therefore, is that no proper exception was taken to the failure to verify the information, and it must be held to have been waived.

We have thus given expression to our views, after a careful consideration of the entire record in this cause, which results in the conclusion that the defendant has had a fair and impartial trial.

His counsel has earnestly and ably presented his cause in the trial court, and has in a careful and painstaking manner presented the questions involved to this court.

The instructions of the trial court were extremely favorable to the defendant, giving the jury an opportunity, if they could possibly take that view of the evidence, to convict him of a lower grade of the offense, including manslaughter in the third degree.

Finding no error prejudicial to the defendant, the judgment will be affirmed, and we direct that the sentence pronounced by the law be executed.    All concur.